## 11117

CARTER *ET AL.* v. CARTER *ET AL.*

(115 S. E., 738)

APPEAL AND ERROR—PRESUMPTIONS IN FAVOR OF FINDING OF FACTS BY CIRCUIT JUDGE.—The presumption is in favor of the findings of fact by the Circuit Judge, and it is incumbent on appellant to show that the findings were erroneous.

Before MAULDIN, J., Greenville, August, 1922. Affirmed.

Action for partition by Yancy Carter and others against Van Carter and others. From a decree for plaintiffs defendants appeal.

E. Inman, Master, filed a report, which, omitting caption, is as follows:

This is an action for partition of the real estate described in the complaint. William Jacobs, who lived near the City of Greenville, owned a number of slaves. His will is dated 1859, and was filed for probate in 1860. Among his slaves was a woman named Dolly Jacobs, and she was the mother of eight children—Jane, the eldest, daughter of a white man; Hettie, the second, also the daughter of a white man; and six children named in the order of their birth, Ella, Fanny, John (or General), Yancy, Warren (Wearin), and Emma, all six of whom are conceded by all parties to have been the children of Jerry Carter, another slave also owned by William Jacobs. The eldest of these was the Ella Easley, mentioned in the complaint, who died intestate January 20, 1919, leaving surviving her no father or mother, no husband and no children, and leaving a considerable estate, as indicated in the complaint. It is conceded that she had title to the property described in the complaint, that Yancy Carter was her duly appointed administrator, that the personal property is sufficient to pay the debts, and that the real estate cannot be very well divided in kind. The real controversy in this action is between Hettie Davis and the children of Jane Walker on the one hand—Hettie and Jane being Dolly's two eldest children—and Yancy Carter and the children of Dolly's other children by Jerry Carter on the other hand. (There was some suggestion of a claim by alleged children of Jerry Carter by a woman named Angeline, or the descendants of such children, but it seems clear that they are not in position to mantain the claim to any portion of the property involved in this case.)

The case turns upon the application of what is known as the Enabling Act of 1865, 13 Statutes at Large, 269, 270,

the fourth section of which provides that "every colored child heretofore born is declared to be the legitimate child of his mother, and also of his colored father, if he is acknowledged by such father." There has been much discussion of the law and facts of the case, but after all the issues are simple. The controlling issue between the parties is, "Have Yancy Carter and the children of the other children, of Jerry and Dolly, established their contention that they are entitled to all the property of Ella Easley to the exclusion of the two oldest children?" This involves, as the main issue of fact, the question, "Was Ella the child of a moral marriage?" It also involves the question of law, "If Ella is not shown to have been the child of a moral marriage, but was illegitimate, being born in concubinage, would Yancy, Fanny, John, Warren, and Emma in relation to Ella, be children of the whole blood under the Statute of Distributions or children of the half blood?" If in law they are children of the whole blood, Yancy and the children of the other children of that set take the entire property; if in law these six are the only children of the half blood, all seven of the children of Dolly and Jerry, other than Ella Easley, if now living, would share equally as children of the half blood, in her property.

(1) Was Ella Easley the child of a moral marriage? In *Taggart v. Taggart*, 89 S. C., 491; 71 S. E., 1081, it was held: "That the evidence failed to establish a moral marriage between Wash and Caroline previous to the birth of Tom." Tom's daughter was, therefore, excluded from sharing in the estate of Wash Taggart, his father. So in this case the evidence fails to establish a moral marriage between Jerry and Dolly previous to the birth of Ella. On the contrary, the evidence seems clear, and I find as a fact, that Ella was born to Dolly before the death of Cheney, the admitted first wife of Jerry Carter, with whom he lived on the Jacobs place, and that Ella, therefore, could not be the child of a moral marriage. As to her father she

was illegitimate, the child of nobody in the eye of the law. *Childs v. Childs,* 93 S. C., 427; 77 S. E., 50, and the cases therein cited. These cases establish the principle that as to the father a slave child is regarded as illegitimate when not the child of a moral marriage but born in concubinage, even though such child be recognized as his by the father. *Roberson v. McCauley,* 61 S. C., 411; 39 S. E., 570. They establish clearly that on the father's side such child has no inheritable blood.

(2) As a matter of law, would a slave child, not the child of a moral marriage, but illegitimate as born in concubinage, be a sister of the whole blood under the Statute of Distribution (Code, § 3555) to other children of the same mother by the same reputed father? When it is said that Dolly's last six children are "legitimate as to the mother," it is answered that under the Act of 1865 this is equally true of her first two children (*Lloyd v. Rawl,* 63 S. C., 219; 41 S. E., 312), and that in the absence of legitimate children of the whole blood, half-brothers and half-sisters, children of the same slave mother, being legitimate as to her, concededly inherit from each other (*Clement v. Riley,* 33 S. C., 67; 11 S. E., 699).

It seems too plain to admit of serious doubt that a child illegitimate on the father's side, that is to say, having no inheritable blood on that side, cannot be regarded as a brother or sister of the whole blood to any person whatever. If the words "whole blood" under the Statute mean anything, they mean inheritable blood.

Compare the case of the illegitimate son of a white woman at the common law; his brothers and sisters, whether born to his mother in lawful wedlock or not, could not inherit from him at all. This would be equally true even though as a fact he had the same father the other children had. Suppose remedial legislation removes the disability on the mother's side; the other children then inherit from his son as children of the half blood; but on the father's side he

is still the son of "nobody"—still, of course, without inheritable blood. Suppose in such case that the mother had several illegitimate sons by the same father; are they all "brothers of the whole blood" under the Statute of Distribution? Obviously not, and that case is identical in principle with the case involved. I can see no possible ground of distinction between them.

In *Childs v. Childs,* 93 S. C., 427; 77 S. E., 50, it was held: "The son of a slave by a woman in concubinage, whom he acknowledged as his son after 1865, is not entitled to inherit with the woman to whom the slave was morally married as such and with whom he lived as his wife after emancipation." But if this son had been lawful as to the whole blood, he would have shared the estate with the widow. In the *Taggart Case,* 89 S. C., 490; 71 S. E., 1081, the fight was between lawful children of Wash Taggart, claiming as his heirs, and a granddaughter, the child of Tom Taggart, a son of Wash Taggart by Caroline Foster, who was not shown to be the child of a moral marriage. Tom's daughter was excluded from participating. If Tom had been under the Statute of Distributions, as the plaintiffs in the case at bar contend, "a brother of the whole blood," she would have shared in the estate.

In *Roberson v. McCauley,* 61 S. C., 411; 39 S. E., 570, the controversy was between Amanda Roberson, a child of Abram McCauley, a slave, born in concubinage but acknowledged by the father as his child, and Mary McCauley, his widow. It was held that Amanda could not share in Abram's real estate; he having died intestate. If she had been "legitimate on the father's part," that is to say, if she had had inheritable blood on the father's side, she would of course have recovered.

In *Watson v. Ellerbe,* 77 S. C., 232; 57 S. E., 855, the controversy related to the estate of Mitchell Humbert, a former slave. It was between Humbert's lawful children and Saphronia Ellerbe claiming an interest as a child of Hum-

bert; it appearing that she was the child of a negro slave woman, not the child of a moral marriage, but recognized by him as his child.. 77 S. C., 233; 57 S. E., 855. It was held that she could not share with the other children. If they had been brothers and sisters of the whole blood with her, as contended in the case at bar, she would, of course, have shared equally with the others. The Court said: "To entitle Saphronia to inherit under either act it must be shown that she was the fruit of a moral marriage, and that the relation existing between her parents was not mere concubinage. A discussion as to what was meant by moral marriages in this Act would be a work of supererogation. The cases of *Davenport v. Caldwell,* 10 S. C., 317; *State v. Whaley,* 10 S. C., 500; Clement v. Riley, 33 S. C., 66; 11 S. E., 699; *Knox v. Moore,* 41 S. C., 355; 19 S. E., 683, and *Roberson v. McCauley, supra,* fully settle this question. Suffice it to say here that it was a term applied to a relation between slaves who, although they had no power to make the marriage contract, yet came together and agreed to live as man and wife. The essence of such an agreement was that it be *bona fide* and that the parties act in accordance with it. Otherwise a moral marriage did not exist. The formal agreement in itself could not constitute moral marriage, for if that were so, all line of demarcation between such marriage and concubinage would disappear. An agreement and cohabitation for a week, a month, or a year would become a moral marriage. There must be that moral intention to assume the duties incident to marriage. The Legislature had in mind only those cases in which there would have been a legal marriage had the parties the power to contract."

I, therefore, conclude as a matter of law that for purposes of inheritance from Ella Easley, all the other seven children of Dolly if living would stand to her in the relation of brothers and sisters of the half blood. It follows that the defendant, Hettie Davis, is entitled to share in the estate equally with Yancy Carter, and that the children of Jane Walker,

who predeceased Ella Easley, also share in the estate, as well
as the lawful children of Fanny, Warren (or Wearin), and
Emma, all of whom predeceased Ella. Fanny Carter married
Smith, and Emma Carter married White. John Carter
died before Ella Easley, but left no lawful children.

Yancy Carter and the others associated in interest with
him have failed to satisfy me that Ella Easley was the child
of a moral marriage; in fact it is not shown that any of
the six children of Dolly by Jerry Carter were children of
a moral marriage. I find, therefore, that the plaintiffs and
the defendants, Hettie Davis, Estella Hall, Maggie Moore,
Clifford Walker, Daisy Cannon (the last four the children
of Jane Walker), and the defendants, Van Carter, Alice
Smith, Fannie Davidson, Mary White McCrary, and Carrie
Cindy White are tenants in common of the land described
in the complaint in the following proportions: Yancy Car-
ter one-sixth thereof; Hettie Davis one-sixth thereof; Es-
tella Hall, Maggie Moore, Daisy Cannon, and Clifford
Walker, the children of Jane Walker, each one twenty-
fourth thereof; Joe Carter, Ella Powell, Hattie Hudson,
and Van Carter, the children of Warren or (Wearin) Car-
ter, each one twenty-fourth thereof; Dolly Smith Hellans
and Alice Smith, each one-twelfth thereof; Fanny Davis,
Mary White McCrary, and Carry Cindy White each one-
eighteenth thereof.

I recommend that the land be sold for cash to the highest
bidder after due advertisement, and the proceeds divided
among the parties hereto in accordance with their respective
interests. Estella Hall, Maggie Moore, and Clifford Walker
are made parties pursuant to order of Judge DeVore Sep-
tember 25, 1920, and appeared by Martin & Blythe, their at-
torneys, taking the same positions in regard to the law and
facts as that taken by Hettie Davis.

I report the testimony herewith, and call attention to the
fact that all parties agreed in open Court that the complaint
should be regarded as amended so as to show that a second

tract of land, 1 5/8 acres, more or less, owned by Jerry Carter at his death and described in the stipulation filed in this case, should be disposed of in like manner as the other real estate herein involved, and I so recommend.

By plaintiffs' attorneys, exceptions to this report were duly served and filed which, omitting caption, are as follows:

To E. Inman, Master, and Martin & Blythe, Attorneys for Hettie Davis and others: Take notice that the plaintiffs except to the Master's report on the following grounds:

I. Because the Master erred in holding that Hettie Davis and Jane Walker's children are entitled to inherit any part of the property of Ella Easley, deceased; whereas, he should have held that Ella, Fannie, John, Yancy, Warren and Emma were the legitimate children of Jerry and Dolly Carter and were legitimate to each other, and, the property involved in this action having belonged to Ella, no one can inherit it except Fannie, Yancy, Warren, and Emma or their children; John having predeceased Ella leaving neither widow nor children; Hettie and Jane being half blood to these six children of Jerry and Dolly.

II. Because the Master erred in failing to compute the amount due by Fannie White Davidson, a niece of Ella Easley and a party to this action, to the estate of Ella Easley for her use and occupation of the house of Ella Easley and for her conversion of the personal property of Ella Easley to her own use.

III. Because the Master erred in finding that there was no moral marriage between Jerry and Dolly Carter; whereas, he should have found that there was a moral marriage between them, and the above-named six children were their legitimate children.

IV. Because the Master erred in not ruling on the testimony of B. F. Martin, Esq., and the alleged order of Judge DeVore, which was obtained without any notice to plaintiff's attorneys and in their absence. The plaintiff's attor-

neys, therefore, move the Court to rule said testimony and said alleged order out.

The decree of Judge Mauldin sustained the exceptions without assigning his reasons for so doing.

Within due time after decree, the defendants, Hettie Davis and the four children of Jane Walker, deceased, Estella Hall, Maggie Moore, Clifford Walker, and Daisy Cannon, by their attorneys, Martin &· Blythe, and also the defendants Alice Smith and Clinton Carter, by their attorneys, H. K. Townes and A. H. Miller, served notices of intention to appeal, and do now appeal, upon the following exceptions:

(1) Because his Honor erred in holding and finding as a matter of fact that there was a moral marriage between Jerry and Dolly at the birth of Ella, deceased intestate in this case (and thus sustaining exception 1 and exception 2 to the master's report on this point); whereas, we respectfully submit that he should have held that plaintiffs must establish such fact by the preponderance of the evidence, and that they failed to do so, the preponderance of the evidence clearly establishing that at the birth of Ella there was no moral marriage existing between the said Jerry and Dolly, and that the said Ella was the fruit of concubinistic relations between Jerry and Dolly.

(2) Because his Honor erred in holding and finding as a matter of fact that there was a moral marriage between Jerry and Dolly, and that therefore the six children, Ella, Fanny, John, Yancy, Warren and Emma were legitimate children of Jerry and Dolly (therefore, sustaining exceptions 1 and 2 to the Master's report upon that point), whereas his Honor should have found as a matter of fact that there was no moral marriage between Jerry and Dolly, and that the said six defendants were the illegitimate children of Jerry and Dolly, the fruit of concubinistic relations existing between them.

(3) Because his Honor erred in holding as a matter of law that Hettie Davis and Jane Walker's children are not entitled to inherit any portion of the property of Ella Easley, deceased (and in thus sustaining exception 1 to the master's report on that point), whereas he should have held that they were entitled to inherit as heirs and distributees of the said Ella Easley in the proportions indicated in the master's report, since all eight of Dolly's children under the law were legitimate as to the mother and illegitimate as to the father.

(4) Because his Honor erred in holding as a matter of law that no one could inherit from Ella Easley except Fanny, Yancy, Warren, and Emma, or their children (John having predeceased Ella without leaving widow or children), and that therefore the plaintiffs were entitled to said property in the proportions indicated in the decree; whereas, his Honor should have held that Ella's sister, Hettie, and the children of Ella's other sister, Jane Walker, are entitled to inherit the same as any other sister or sister's children.

(5) A separate and further exception of Alice Smith and Clinton Carter is taken upon error of his Honor in holding as a matter of law that no one could inherit from Ella Easley except Fanny, Yancy, Warren, and Emma, or their children (John having predeceased Ella without leaving widow or children), and that, therefore the plaintiffs were entitled to said property in the proportions indicated in the decree; whereas, his Honor should have held that Alice Smith and Clinton Carter are entitled to inherit as children of Ella Easley's sister Emma in the same proportions as children of any other deceased brother or sister.

(6) Because his Honor erred as a matter of law in sustaining the fourth exception to the Master's report herein, ruling that the Master erred in not passing on the testimony of B. F. Martin and the alleged order of Judge DeVore on the ground that same was obtained without any notice to plaintiff's attorneys and in their absence, and in ruling out said testimony and order upon that ground.

Specifications: (1) The writing in evidence was not really any order, merely Judge DeVore's interpretation of said order; (2) no notice was necessary to plaintiff's attorneys of an application to Judge DeVore for such construction of his own order; and (3) if it were, there would be no legal grounds for the exclusion of its evidence.

*Mr. Henry K. Townes,* for Alice Smith, appellant.

*Messrs. Martin & Blythe,* for Hettie Davis, *et al.* appellants, cite: *Slave marriages:* 36 S. C., 452; 93 S. C., 427; 41 S. C., 355; 118 S. C., 102; 97 S. C., 330.

*Mr. Adam C. Welborn,* for respondents, cites: *Presumption of legitimacy:* 118 S. C., 420. *Slave marriages:* 13 Stat., 271, 291; 36 S. C., 454; 10 S. C., 341; 33 S. C., 82; 41 S. C., 361. *Proof of marriage:* 3 Rich. L. 434; 89 S. C., 490; 101 S. C., 40. *Children of legitimate as to mother inherit equally from her:* 63 S. C., 219. *Half blood cannot inherit where there is whole blood:* 1 Civ. Code 1912, Sec. 3555; 4 DeS., 405; 1 McC., 456; Riley, Ch., 117. *Illegitimate children of predeceased sister cannot inherit:* 25 Stat., 156; 1 Civ. Code 1912, Sec. 3562; 31 Stat., 1039; 116 S. C., 235. *Moral marriages:* 10 S. C., 500; 20 S. C., 522; 61 S. C., 411; 63 S. C., 219; 77 S. C., 232; 93 S. C., 427; 107 S. C., 81; 118 S. C., 102.

January 23, 1923.

The opinion of the Court was deilvered by MR. CHIEF JUSTICE GARY.

This is an action for partition. The rights of the parties are dependent upon the question whether there was a moral marriage between slaves, and the recognition of the children born of them as legitimate.

The facts are fully stated in the report of the Master, which was in favor of the defendants, and to which the plaintiffs filed exceptions. On hearing the report of the Master, his Honor, the Circuit Judge, sustained the excep-

tions, but did not refer specifically to the testimony upon which he based his conclusion. The defendants appealed upon exceptions which, together with the Master's report, the plaintiffs' exceptions to it, and the defendants' grounds of appeal, will be reported.

In their argument the appellants' attorneys say:

*"Was Ella Easley the child of a moral marriage, or was she born in concubinage?* We invite the earnest attention of the Court to this question of fact, for the whole case turns upon it."

We also take the view that this is the question upon which all others in the case are dependent. The presumption is in favor of the findings of fact by his Honor, the Circuit Judge, and it is incumbent on the appellants' attorneys to satisfy this Court that they were erroneous.

The appellants' attorneys have discussed the testimony at great length and in detail, but they have failed to satisfy this Court that there was error on the part of his Honor, the Circuit Judge.

Affirmed.

MR. JUSTICES WATTS and FRASER concur.

MR. JUSTICE COTHRAN (dissenting): After careful review of the record in this case I feel satisfied that the Master's report is right and should have been confirmed.

The evidence, to my mind, is overwhelming that during the period of slavery, Jerry Carter and the woman, Chaney, sustained the relation of husband and wife morally, and that while this relation subsisted, Jerry maintained illicit relations with the woman, Dolly, the fruit of which were the intestate, Ella Easley, and her five brothers and sisters, through whom the plaintiffs claim. There is not a particle of evidence tending to show that there was any pretense of marriage between Jerry and Dolly until after the death of his first wife, Chaney. Even the leading plaintiff, Yancey Carter, son of Jerry and Dolly, and brother of Ella, testifies to the marriage relations of Jerry and Chaney and

to the marriage after Chaney's death of Jerry and his own mother, Dolly. The children, Ella, Fanny, and John were older than Yancey, and if his birth occurred during the lifetime of Chaney, and while she was the reputed wife of Jerry, their births, preceding his, occurred during the same period.

Furthermore, respectable white witnesses testified to the fact that Jerry and Chaney were husband and wife; that they lived together in a house that was built off nearly a quarter of a mile from the old Jacobs' house, where Dolly lived, and that at that time there were several of these children of Jerry and Dolly around there—Ella, being the oldest of them, was necessarily among that number.

If, therefore, the intestate was the illegitimate child of her father, notwithstanding the Act of 1865 (13 Stat. at Large, p. 291), making her the legitimate child of her mother, she bore the same relation to her brothers and sisters, who were actually of the full blood as if each had had a different father, for each one, so far as the father is concerned, is *nullius filius* or *filia*. She then bore the same relation to the first of the two children, Janie and Hettie, begotten by white men, as to her full brothers and sisters, children of Jerry and Dolly, namely, of the half blood. The authorities cited by the very able Master are clear to the point.

MR. JUSTICE MARION concurs.